# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHAUN J. MATZ,

                    Plaintiff,


          -vs-                                    Case No.   05-C-1093

MATTHEW FRANK, PHIL KINGSTON,
MARC CLEMENTS, STEVE SCHUELER,
GARY ANKARLO, DR. KEVIN KALLAS, M.D.,
RALPH FROELICH, BELINDA SCHRUBBE,
GEORGE KAEMMERER, JENNIFER SPOTTS,
SGT. MALLAS and JOHN DOES,

                    Defendants.

# DECISION AND ORDER

          Plaintiff Shaun J. Matz, who was incarcerated at Waupun Correctional Institution at all times relevant to his complaint, lodged a *pro se* civil rights complaint under 42 U.S.C. § 1983. The plaintiff was allowed to proceed *in forma pauperis* on conditions of confinement, deliberate indifference to mental health, and due process claims. The court previously granted summary judgment in defendants' favor on the plaintiff's due process claims because the plaintiff failed to exhaust his administrative remedies before filing this action. Before the court now is the defendants' second motion for summary judgment on the plaintiff's remaining claims. The court will also address several other pending motions.

# I. SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact, and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine

2

issue for trial. "). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## II. FACTS[1]

### Parties

The plaintiff is a Wisconsin state prisoner. His claims relate to his incarceration in the Health and Segregation Complex (HSC) at Waupun Correctional Institution (WCI) from February 14, 2005, until he was transferred to Columbia Correctional Institution on December 2, 2005.

---

[1] The facts are taken largely from the Defendants' Proposed Findings of Fact (Docket # 88), to which the plaintiff failed to respond. The plaintiff has filed several pleadings of his own that contain allegations of fact, but they do not include citations to the record. The plaintiff's failure to file a response to the defendants' proposed finding of fact, and the deficiencies in his own pleadings violate Eastern District of Wisconsin Civil Local Rule 56.2. As such, they will be disregarded. *See* E.D. Wis. Civ. L.R. 56.2(e); *Fabriko Acquisition Corp. v. Prokos*, __ F.3d __, No. 06-3889, 2008 WL 2894376, at *2 (July 29, 2008); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) (pro se civil litigants required to follow procedural rules). To the extent that the plaintiff's pleadings comply with Fed. R. Civ. P. 56(e) and present admissible evidence, the facts therein were considered by the court.

3

Defendant Marc Clements (Clements) was employed by the Wisconsin Department of Corrections (DOC) as Security Director at WCI from July 16, 2000 to March 18, 2006. In this capacity, Clements had the general responsibilities of administering and supervising the security program for the institution, planning security program changes, directing the assignments of subordinate staff, and recommending security policy to the Deputy Warden and Warden.

Defendant Steven Schueler (Schueler) was employed by the DOC as a Supervising Officer 2 at WCI. In this capacity, Schueler's duties included, but were not limited to, the supervision of all correctional officers, correctional sergeants, and supervising officer 1's on an assigned shift. He also had the responsibility for the overall direction and operation of an assigned shift. In addition, Schueler had the responsibility for the supervision and treatment of inmates.

Defendant Jodi Gerritson (Mallas) was employed by DOC at WCI from August 11, 2002 through June 17, 2006. At the times relevant to the plaintiff's complaint, Mallas was a Sergeant and her duties included, but were not limited to, monitoring the various housing units and main lobby as necessary. Mallas was also responsible for the general supervision of inmates.

Defendant Gary Ankarlo (Ankarlo) is employed by the DOC as a Psychological Service Unit (PSU) Supervisor at WCI. Under the general supervision of the Deputy Warden, Ankarlo is responsible for the overall administration of the PSU at WCI. Ankarlo

4

is responsible for the development, administration and coordination of all psychological programs within the unit, including supervision of the staff, provision of direct services, consultation and support activities. In addition, Ankarlo provides psychological services to inmates, makes recommendations for institutional programming, assists in providing training to staff, and participates with other PSU staff in structured case conferences and staffing. Ankarlo received his Ph.D. from University of Wisconsin - Madison in 1998. He has been a Licensed Psychologist in the State of Wisconsin continuously since 2000. Ankarlo began his employment with WCI on October 16, 1995, and he has been a PSU Supervisor since 2002.

Defendant Ralph Froelich (Froelich) is employed by the DOC as a Medical Consultant-Psychiatrist (limited-term employment (LTE)) at WCI; Froelich began his employment with WCI on May 7, 2004. Under the administrative direction of the Bureau of Health Services (BHS) Director and the professional supervision of the Medical Director, Froelich is responsible for professional psychiatric services to inmates. Froelich tends to the mental health needs of inmates, diagnosing, treating, and arranging for professional consultation when warranted. He also supervises, in conjunction with the Health Service Unit Manager, the development and implementation of treatment protocols and patient flow charts.

Defendant Jennifer Spotts (Spotts) was employed by DOC as a Psychological Associate B at WCI, from June 25, 2004 until she transferred to her current employment at

5

the Racine Correctional Institution on May 14, 2006. Under the general supervision of the Psychologist Supervisor, Spotts' duties included providing direct services to offenders, consulting psychiatrists and other institutions and field staff involved in planning the total program of a given inmate.

Defendant George Kaemmerer (Kaemmerer) is employed by DOC as a Crisis Intervention Worker at WCI; he has been employed at WCI since June 16, 1980. Under the general supervision of the psychologist supervisor, Kaemmerer provides development, implementation, and coordination of strategies to manage inmates with mental health problems due to environmental stressors within the institution. He also provides direct services to residents in crisis situations.

Defendant Belinda Schrubbe (Schrubbe) has been employed as the Manager of the Health Services Unit (HSU) at WCI, since December 9, 2001. As HSU Manager, Schrubbe's responsibilities include, but are not limited to, management and supervision of health care services provided, developing health care procedures, monitoring care plans, and preparing required reports. Although defendant Schrubbe is the HSU Manager at WCI, she does not oversee the PSU, which has its own supervisor, Gary Ankarlo. Schrubbe had no personal involvement with the psychological care given to Matz. Schrubbe has no role in implementing mental health screening tools for the evaluation of offenders within HSC and/or other similar extended control facilities. Schrubbe is aware of the general conditions in HSC and does not believe they pose a substantial risk of serious harm to inmates' health

6

or safety. Schrubbe has no direct supervisory control over inmate placement decisions. At no time did Schrubbe have any personal contact or involvement with Matz regarding cell placement.

Defendant Phil Kingston (Kingston) was employed by the DOC as the interim warden and warden of WCI from November 12, 2004 until his retirement on March 31, 2007. In that capacity, Kingston had the duties and responsibilities as generally defined by Wis. Stat. § 302.04, and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. Kingston's duties as warden included general responsibility for the overall operation and administration of WCI, including the institution-level implementation of all DOC policies and directives and legislative and judicial mandates. Kingston exercised no control over or input into HSU staff medical diagnostic and treatment decisions. Kingston exercised no day-to-day control over HSU decisions in calendaring appointments or prescribing medication for inmates with medical staff. Kingston had no role in implementing mental health screening tools for the evaluation of offenders within HSC and/or other similar extended control facilities. Further, Kingston did not participate in decisions regarding the placement of inmates in particular cells, and did not participate in any decision regarding the cell placement of Matz. Kingston is aware of the general conditions in HSC and does not believe they pose a substantial risk of serious harm to inmates' health or safety. At no time did Kingston have any personal contact or involvement with Matz

7

regarding cell placement. Kingston had no personal involvement with the medical or psychological care given to Matz.

Defendant Matthew Frank (Frank) was appointed as Secretary of the Wisconsin Department of Corrections (DOC) on January 6, 2003. In that capacity, Frank had the responsibilities as generally defined by Wis. Stat. § 15.04, and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. These duties could also be carried out by one of his designees under his supervision. Although Frank has general supervisory authority over the DOC operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day operations of individual correctional institutions. Frank does not participate in decisions regarding the placement of inmates in particular cells, and did not participate in any decision regarding the cell placement of Matz. Such decisions are made by correctional staff within each institution. Frank had no role in implementing mental health screening tools for the evaluation of offenders within HSC and/or other similar extended control facilities. Frank has no direct supervisory control over institution employees, nor does he have any control over their inmate placement decisions. Frank does not provide medical services to inmates at WCI. Such diagnostic and treatment services are provided to inmates by practitioners employed by the DOC within the Bureau of Health Services and assigned to the institutional Health Services Unit (HSU). Frank exercises no day-to-day supervisory control over HSU employees; nor does he have any control over their diagnostic and treatment decisions. Frank exercises no day-to-day control over HSU

8

decisions in calendaring appointments for inmates with medical staff. At no time did Frank have any personal contact or involvement with Matz regarding cell placement. Frank had no personal involvement with the medical or psychological care given to Matz.

Defendant Kevin Kallas, M.D. (Kallas) has been employed as the DOC Mental Health Director since November 2002. In this capacity, Kallas directly supervise the psychiatrists employed by the department. Kallas is not and has never been employed at WCI, where Matz was housed at all times relevant to this action. As an Administrator, Kallas is not routinely involved in clinical decisions regarding particular inmates at the point of intake or any other time. Kallas had no personal involvement with the medical or psychological care given to Matz.

### Conditions of Confinement

On or about February 14, 2005, Matz was placed in WCI's HSC for his involvement in a physical altercation with another inmate. There are three different steps that come with different privileges while an inmate is housed in HSC with step 1 being the most restrictive. For the majority of the time he was housed in HSC, Matz was at step 1; however Matz was step 2 for one review period and step 3 for one review period.

The HSC building at WCI can house 180 inmates. The HSC building is meant to house inmates from general population who have violated rules of the institution and have been placed in a segregated status.

9

HSC prisoners have the opportunity to go to shower two times per week, to go to recreation up to four hours weekly, to go to legal recreation (in the legal recreation room, one on each wing), to go to medical appointments, and to have video visits with family and friends. At all other times, the inmates are confined to their cells. Inmates have contact with prison personnel on a daily basis as meal trays are handed out or as staff walk by their cells to transport other inmates. Also, contact with others is made when the inmates shower, go to HSU appointments, go to recreation or legal recreation, or have attorney visits, or family or friends visits.

There is a concrete divider down the center of each wing in HSC. There are intermittent breaks in the wall of each concrete divider. The defendants aver that the divider is designed for the safety and security of the staff and offenders. HSC cell doors are made of steel with an observation window in them. The light fixture in each inmate cell in HSC has a total of four florescent tubes. The nine-watt tube florescent nightlight is in the center of the light fixture and is illuminated at all times. The inmate controls four settings. The first position turns on a center 32-watt T8 florescent tube. The second position turns on two 32-watt T8 florescent tubes positioned on either side of the center tube. The third position turns on all three 32-watt tubes. The fourth position turns off all of the three 32-watt T8 florescent tubes but the nightlight remains on.

Since 1998, the nightlight has been a nine-watt, tube florescent light inside a fixture mounted high on the wall at the point where the wall and ceiling meet. For security

10

and safety reasons, the nightlight is designed to be illuminated even in the event of a power outage by using WCI's self-contained power generation capacity. Illumination levels may vary slightly from cell to cell due to the age of bulbs and the different brands in use. The plaintiff alleges that the nine-watt bulb causes sleep deprivation. He also maintains that he was in observation for much of his time in the HSC and, while there, was subjected to constant illumination by two nine-watt bulbs.

The defendants aver that for the safety of the inmates and staff as well as for the security of the institution, DOC officers need a clear view of the inmates. Officers need to be able to establish that there is a person actually in the cell and that all activity in the cell is normal, that the inmate is alive and breathing. The officer needs to see the inmate to determine that the inmate is not sick, injured or in need of medical assistance.

According to the defendants, all cells in HSC offer natural sunlight because each cell has a frosted window through which sunlight passes. Inmates can also see the outdoors and natural sunlight in the recreation pens. There are six recreation pens at the end of each upper and lower wing in HSC which offer a social opportunity as well as a change of environment from the inmates' cells. The pens vary in size from approximately 8 feet x 8 feet to 8 feet x 10 feet. The pens are designed to separate inmates for their safety. The recreation pens are generally all utilized during recreation times, so the inmates have five other inmates with whom to socialize. The pens have openings high up that are covered with nothing but wire and allow in natural light, air, breezes, scents from the kitchen at times, and

11

scents from the state farm. The recreation pens offer an opportunity for the inmate to engage in any self-motivated exercise and to socialize with other inmates attending recreation.

The inmates are not allowed outside of the HSC building, although inmates that have court appearances and off-site medical appointments are allowed to leave the building. HSC inmates are provided with video visits with family and friends and the visitations are done on closed circuit cameras for inmates in HSC. The visitation in HSC consists of the inmate sitting in an HSC booth outside of his cell looking at and listening to the television monitor while the visitor is in a booth in the visit center looking at and listening to a television monitor.

Wisconsin Administrative Code § DOC 303.70 lists the items that inmates are entitled to possess while in segregation status. Consistent with the Administrative Code, the WCI Segregation Handbook lists the allowable personal property that an inmate may possess while in program segregation in HSC at WCI. Inmates in Temporary Lock Up, Program Segregation, Disciplinary Separation, Protective Confinement and Administrative Confinement in HSC, specifically while on "Step 1" and "Step 2" statuses may have the following property and/or items in their cell: one (1) pair state-issued socks, one (1) state-issued undershorts, one (1) state-issued T-shirts, one (1) pair state-issued segregation canvas shoes, one (1) set state-issued segregation uniform, one (1) state-issued washcloth, one (1) state-issued hand towel, two (2) state-issued bed sheets, two (2) state-issued blankets, one (1) state-issued pillow, one (1) state-issued pillowcase, one (1) state-issued mattress, one (1)

12

state-issued roll of toilet paper, one (1) state-issued bar of soap (in-cell use only), one (1) state-issued toothbrush, one (1) state-issued tube of toothpaste, one (1) state-issued comb or pick, one (1) approved wedding ring (must be married and ring must be worn on finger), one (1) pair prescription eyeglasses, denture or partial plate and container, legal materials (limit of two (2) shopping bags), first class mail (limit of 25 personal letters), one (1) Address book, one (1) box acetaminophen tablets 325 mg., one (1) box antacid tablets, one (1) box ibuprofen tablets 200 mg., one (1) tube of Vaseline, fifty (50) stamps, two (2) pads paper, one (1) pack carbon paper, one (1) box envelopes, five (5) legal size manila envelopes, one (1) file folder, one (1) expanding wallet folder, one (1) pocket dictionary, one (1) of either a Bible, Queran, Torah, Book of Shadows, or equivalent religious book, one (1) pair shower thongs, one (1) television ("PC," "ADM," Step 3; C-Wing only), one (1) radio or existing radio/cassette combo ("PC," "ADM," Step 3; C-Wing only), one (1) earplugs* ("PC," "ADM," Step 3; C-Wing only), one (1) headset ("PC," "ADM," Step 3; C-Wing only), cable & transformer for electronics ("PC," "ADM," Step 3; C-Wing only), Segregation Unit inmates will be issued the insert of a pen only.

Every Sunday during second shift at WCI, free library books are made available to inmates in segregation. Inmates in Steps 1, 2, 3 of segregated status may receive two books at a time. The books are handed out on an exchange basis only. By definition, the books made available to inmates in segregated status during this Sunday distribution are limited to the books maintained by the WCI library.

13

Security staff is responsible for the placement of inmates in HSC and the release of inmates from HSC. PSU has no authority over the placement of inmates in HSC or the removal of inmates from HSC. Matz arrived in the HSC unit on February 14, 2005. Schueler and Clements had no role in Matz' initial intake or PSU evaluation upon entering HSC. Once in HSC, Matz made numerous requests to be transferred to the Wisconsin Resource Center (WRC), to be transferred to another maximum security facility, or to be placed into General Population. Most of these requests came after he had inquired if he was going to be placed into Administrative Confinement when released from his segregation time, and was informed that this was likely. Schueler and Clements' response to Matz' requests was generally to the effect that his behavior dictated where he was housed. Indeed, neither Schueler nor Clements have sole authority to transfer inmates to WRC or any other institution.

Matz further alleges that while in HSC, on June 17, 2005, he was placed into a cell that contained human feces and pieces of broken glass, and that despite complaining to both Schueler and Mallas regarding this, he was not moved from this cell. Matz had been moved to a new cell earlier in the day when the floor drain in the cell that he currently occupied had been damaged. Schueler reported to Matz' cell later that day because Matz had his windows covered with paper and refused to take the paper down when directed by staff. Due to Matz' actions of covering his window, Schueler placed him on a paper restriction which required the paper to be removed from his cell. Matz refused to hand out his paper

14

and Schueler explained that the restriction would be enforced, even if it meant assembling a cell entry team to effect it. Matz initially refused to comply. As the cell extraction team was assembled and reported to Matz' cell, Matz stated that he was going to kill himself. Matz ultimately complied as the cell entry team approached to escort him from his cell; Matz stepped to the front of his cell and placed his hands out of the trap and was escorted to a shower cage.

While Matz was out of this cell, the cell was inspected and no feces or broken glass pieces were found. It appeared that Matz used the broken floor drain to attempt to break his light fixture and had dented it and cracked some of the internal Plexiglass. The light fixture was not externally cracked, and there was nothing exposed or available with which Matz could harm himself. Matz was returned to the same cell and placed in observation status because he had threatened that he was going to kill himself. Inmates in observation status are given limited property and are more closely monitored. Matz was given only a high security mattress, and no other property.

Mallas has no recollection of Matz informing her that there were human feces and/or broken glass in his cell. If Matz had informed Mallas that there were human feces and pieces of broken glass in his cell, she would have contacted her supervisor, Steven Schueler. If human feces or broken glass had been found in Matz' cell, Schueler would have either moved Matz, or cleaned out his cell. Schueler and Mallas do not condone such conditions.

15

Each time the plaintiff attempted to harm himself, an incident report was filed and Schueler and/or Clements was then notified. On each occasion, steps were taken to ensure the plaintiff's health and safety, such as placing the plaintiff into an observation cell and/or contacting the appropriate clinical medical staff for evaluation. The defendants aver that at no time did Schueler, Clements and/or Mallas believe that placing or keeping Matz in HSC posed a substantial risk of serious harm to Matz' health or safety.

Schueler, Clements, and Mallas had no personal involvement with the medical and psychological care given to Matz. Schueler, Clements and Mallas have no role in implementing mental health screening tools for the evaluation of inmates within HSC and/or other similar extended control facilities. Schueler and Clements do not and are not qualified to provide medical and psychological services to inmates at WCI. Such diagnostic and treatment services are provided to inmates by the HSU and PSU. Schueler and Clements exercise no control over or input into HSU and PSU staff medical/psychological diagnostic and treatment decisions. They exercise no day-to-day control over HSU and PSU decisions in calendaring appointments or prescribing medication for inmates with medical staff. Schueler and Clements have no knowledge of, nor were they ever personally involved in, any decisions concerning any treatment plans, programs, or any other decisions related to Matz' mental health needs, including transfers out of HSC.

16

## Deliberate Indifference to Mental Health

Inmates who violate the rules of the DOC 303 and might otherwise engage in activities that threaten the safety and security of the institution at WCI are placed in the HSC. Security staff is responsible for the placement of inmates in HSC and the release of inmates from HSC. There is no mental illness screening tool that the DOC uses in placing inmates in HSC. A mental illness screening is not required to place an inmate in segregation status in any DOC institution except for the Wisconsin Secure Program Facility.

Upon an inmate's transfer to HSC, Ankarlo reviews the WCI internal PSU database. If at that time it is determined that the inmate has mental health needs, Ankarlo will refer them to an HSC clinician. The clinician will see the inmate and assess if additional mental health services are required.

PSU has no authority over the placement of inmates in HSC or the removal of inmates from HSC. PSU can recommend transfer to the Wisconsin Resource Center (WRC) for mentally ill inmates. However, the recommendation must be approved by WRC. Per consultation with WRC staff, Matz was not an appropriate candidate for treatment at WRC. Inmates transferred to WRC in segregation status remain in segregation status while housed at WRC.

WCI employs two full-time licensed staff psychologists, one full-time psychological associate, one full-time crisis intervention worker and one half-time psychological associate. Inmates on clinical monitoring are seen every one to six months

17

depending on their symptoms, needs and degree of mental illness. Every inmate has different needs, so one inmate might receive more psychological services than another.

Matz was confined to HSC from February 14, 2005 until December 2, 2005. At the time of his placement at WCI, Matz was diagnosed with a history of Tourette's Syndrome and Antisocial Personality Disorder with a history of borderline personality traits. The use of the word history in a psychological diagnosis indicates that the individual had the disorder in the past, but is not currently experiencing symptoms of that disorder. At all times relevant to this action is mental health rating was a "MH-1," which indicates that he did not have a serious mental illness. Matz' diagnoses did not change during the relevant time period. Matz does not suffer from Major Depression and does not have Explosive Disorder or Schizoaffective Disorder. Regardless of Matz' diagnoses, PSU does not have the authority to place or remove an individual from segregation status.

While housed in the HSC, Matz was personally evaluated by the defendants on numerous occasions. On February 17, 2005, Dr. Sara Coleman conducted a face-to-face clinical interview with the plaintiff. She noted no significant mental health issues and told Matz to contact PSU if he had any mental health needs.

On February 28, 2005, Kaemmerer saw Matz per a referral from HSC security. Matz reported that he was not sure if he could handle a year in HSC. Kaemmerer informed Matz that he would be happy to speak with him whenever he needed. Matz' mental status

18

was unremarkable and he presented with nothing to suggest that he experienced symptoms associated with mental illness or emotional disturbance.

On March 21, 2005, Froelich saw Matz in HSC in the due process examining room. Matz was alert, oriented and cooperative. Because Matz stated he would be in HSC for a year, Froelich attempted to establish a rapport with Matz. Matz agreed to restart part of the medication that he believed helped control his intensity and his mood cycling. Froelich prescribed Olanzapene, 10 mg, priority #1, once every evening, with medication monitoring. Olanzapene is an atypical anti-psychotic medication and in this case was used to help control the intensity of Matz' anger and help him use his coping skills and engage in less self-defeating behavior.

On May 25, 2005, Kaemmerer saw Matz for a post-observation MH-1 (mental health 1) monitoring. Matz reported that he was feeling disoriented and wondered if this could be the result of taking too much medication a few days prior. His mental status was unremarkable for symptoms associated with mental illness or emotional instability. Kaemmerer advised that Matz allow for the passage of time for the effects of his overdose to dissipate. Kaemmerer's plan was to see Matz again soon.

On June 2, 2005, Matz made a request to talk to PSU about a psychotic episode he was having, and he met with Kaemmerer the same day. Matz reported that he was "losing it," was having devious thoughts, and was concerned about his impulsive behavior. Kaemmerer noted that there was nothing about Matz' presentation that suggested emotional

19

disturbance or mental instability. Kaemmerer gave Matz support, potential motivational goals, and close PSU monitoring.

On June 8, 2005, Kaemmerer saw Matz for a follow-up to his June 2, 2005 appointment. Matz reported that he was doing okay, but that he was helpless regarding the reasons for his behavior and the ability to stop himself. His presentation was unremarkable for symptoms of major illness or for emotional disturbance. Kaemmerer's plan was for continued MH-1 monitoring.

On June 13, 2005, Froelich saw Matz in the due process room in HSC. Matz reported that he broke the window on his cell and then cut himself on the glass that came from the cell window. He described having a lot of anxiety and stated that he snapped for no reason. Matz reported that he did not have thoughts of harming himself unless he got worked up. Matz was initially cooperative, became increasingly angry, began yelling very loudly, and stated that he no longer wanted to see Froelich, but when Froelich refused to give him medications that he wanted, he stated that it would be Froelich's fault for his behavior. Froelich explained to him that the medications had not helped him control his behavior previously and that he should assume responsibility for his own behavior. Froelich told him several times that he would see him for return visits on his weekly trips to WCI. However, at the end of this meeting, Matz was very angry and stated he no longer wanted to see Froelich. No medications were ordered at that time.

20

On June 13, 2005, Ankarlo saw Matz per his request to HSC security to see him. Matz was upset because Dr. Froelich had allegedly discontinued his medications and he did not know how he would cope in HSC without them. He asked if he could be referred to WRC for coping skills treatment or be transferred to a different institution. Ankarlo found Matz' mental status normal and told Matz that he would consult with WRC regarding him going there for coping skills treatment. As this was a brief un-scheduled contact at Matz' cell front, no therapeutic interventions were attempted.

On June 21, 2005, Ankarlo saw Matz. Ankarlo informed Matz that he had spoken with WRC staff and that they would not approve a referral for him to be transferred there because of his behavior and lack of substantiated treatment needs. Matz acknowledged the assessment by WRC, but expressed that he still wanted to return to that facility. Matz discussed his feelings of frustration with being in segregation and the fact that he cut himself the prior week. He reported that he had no thoughts of harming himself or others at that time. Matz also wanted to know if he could be transferred via a segregation trade.[2] Ankarlo agreed to pass that request on to security, who ultimately would make this decision. This was passed onto Captain Schueler. Ankarlo suggested to Matz that he attempt to the follow the rules.

---

[2] A segregation trade is a security decision to transfer one inmate in segregation for another inmate in segregation at one of the other maximum security institutions.

On June 22, 2005, Kaemmerer saw Matz for MH-1 monitoring. Matz reported that he was doing fine. His mental status was unremarkable. Kaemmerer's plan was to continue MH-1 monitoring.

On July 14, 2005, Maz requested a visit with Spotts during her routine clinical rounds. Matz reported he was feeling okay, but he stated that he wanted to discuss his current diagnosis and felt he should be given medication. He denied having any mental health needs or suicidal/self-harm thoughts at that time. Spotts encouraged Matz to submit a HSU request to be seen by Dr. Froelich to address his medication concerns. Matz agreed to submit a written request to PSU if he needed additional clinical services.

On August 1, 2005 Matz made a request to security and saw Ankarlo. Matz expressed that he was still upset that he would not be transferred any time in the near future. Matz stated that he did not want to talk to Ankarlo ever again. Ankarlo noted that Matz had continued thoughts of harm to others, but that there was no immediate risk to others given his security status. Ankarlo could not offer any further therapeutic intervention at that time because Matz did not want to speak with him any further. However, Ankarlo informed Matz that should he change his mind, he could send in a request and Ankarlo would schedule an appointment to see him. Regardless, Matz would be followed by HSC clinicians as needed. As PSU supervisor, Ankarlo is continually informed of an inmate's mental health treatment, and was continually informed of Matz' treatment in this case.

22

On August 3, 2005, Spotts again saw Matz during her routine rounds per his request. Matz reported that he wanted to be transferred out of segregation to North Program or to another institution, if possible. Matz stated he felt that he was not getting the clinical health treatment he needed and that he was no longer going to be seen by Dr. Ankarlo because Dr. Ankarlo did not care about him. Although Matz was angry and agitated, he was psychiatrically stable at that time. Spotts informed Matz that his concerns would be brought to the PSU staff. PSU staff encouraged him to take personal responsibility for his role in his current situation by using pro-social coping strategies.

On August 5, 2005, HSC security contacted the PSU and informed them that Matz possessed a broken eye glass piece and was threatening to kill himself by holding it up to his throat. As Spotts approached his cell front, Matz was talking with security staff and was loud and disruptive. Once Spotts approached, he became calm and agreed to speak with her. Matz expressed anger, stating that he was being harassed by security staff and that his mental health needs were not being addressed by HSC. He requested to be transferred out of WCI to another institution. Matz reported that he did not want to hurt anyone or himself, but that he was angry. He was able to identify and verbalize that this type of behavior had not been beneficial in the past and was unlikely to improve his situation. Matz agreed to give the broken eye glass piece to security staff and divulged that he had numerous other items that were not allowed property due to his sharp object restriction. Matz agreed to give these items to security staff, agreed to a cell search and agreed to a strip search. Matz denied

23

having any thoughts of suicide or self-harm and related his current/past behavior to anger. Matz was psychiatrically stable at that time and Spotts' plan was that Matz continue to be followed by PSU for clinical monitoring.

On August 8, 2005, Kaemmerer saw Matz for MH-1 follow-up. Matz had recently acted out with self-injurious behavior. Matz was smiling and reported that he was doing fine. His mental status was unremarkable for clinical symptoms. Kaemmerer's plan was to continue MH-1 monitoring.

On August 9, 2005, HSC security request that Kaemmerer talk to Matz because Matz was withholding his meal tray. Matz reported that he was withholding his meal tray in solidarity with another offender who was placed in controlled segregation. His mental status was unremarkable for mental or emotional disturbance. Kaemmerer discussed Matz' motive in withholding his meal tray with him, and Matz calmed down and returned his meal tray after his discussion with Kaemmerer.

On August 10, 2005, Matz requested a visit with Spotts while she was reviewing another inmate in observation. Matz reported to Spotts that he had not received any recent conduct reports but that he held on to his meal tray the day before. Matz eventually turned in the meal tray after speaking with Kaemmerer, the Crisis Intervention Worker. Matz also reported that he spoke with the HSC Social Worker who advised him to contact clinical services regarding a transfer recommendation. Matz' only complaints related to DOC staff and the conditions in the HSC. Matz was psychiatrically stable. Spotts

24

encouraged Matz to address his psychological concerns to the Crisis Intervention Worker while on tier 1 and herself while on tier 2. He agreed to do so. Spotts' plan was that Matz continue to be followed by PSU for clinical monitoring. Matz further reported that he was angry at a security officer. He was able to identify how his distrust of others was having a negative impact on his interpersonal relationships. Matz denied experiencing suicidal/homicidal thoughts, plans, or intent or thoughts of self-harm or harm to others. Spotts encouraged Matz to recognize his responsibility in dealing with the consequences of the behavioral choices he makes.

On August 16, 2005, Kaemmerer saw Matz per HSC security's request. Matz reported that his was agitated over his perception that HSC staff was "f__cking with him." He exhibited an angry mood and cognitive distortions. Kaemmerer noted some effect.

On August 18, 2005, Froelich saw Matz in the HSC while Matz was on observation status. Matz has been placed on observation status because of threats against himself, and agitated and abusive behavior. Matz reported to Froelich that he was agitated and wanted something to slow himself down. He said he was not actively having thoughts of harming himself and wanted to cooperate with the medication approach. Matz said he wanted something to help him regain control of his behavior. Froelich prescribed Geodon, 40 mg twice a day. Geodon is an atypical antipsychotic medication used to help control the intensity of Matz' anger and help him to make decisions about behavior that would be less self-defeating.

Case 2:05-cv-01093-RTR   Filed 09/09/08   Page 25 of 42   Document 142

On August 23, 2005, Spotts saw Matz at the request of security, because he refused to return a spit mask to security. Matz reported that he did not complete his behavioral contingency agreement and was placed in restraints the week prior after breaking his light with his meal tray.[3] When Matz withheld his meal tray, he violated the agreement. He therefore did not complete his behavioral agreement.

On August 31, 2005, Kaemmerer saw Matz for MH-1 monitoring. Matz reported that he was doing okay. His mental status was unremarkable. Kaemmerer's plan was to continue MH-1 monitoring.

On September 7, 2005, Spotts saw Matz for clinical monitoring and in response to a referral from security who reported that Matz was requesting to be seen. Matz reported that he was "gassed" by security over the weekend and stated "they were going to shoot [him] with a shot gun." He also stated that he "booby trapped" his cell by ripping sheets and tying them from the restraint hooks. Matz reportedly did this after refusing to comply with several requests to hand over a restricted item. He appeared to have been doing this in an attempt to annoy and/or possibly injure security staff. Although Matz was irritable, he denied

---

[3] Matz had been given a behavioral agreement by a member of the PSU staff outlining expected behavior and alternatives to acting out destructively or violently. Although Spotts is not certain exactly what this agreement stated, it would have likely stated something to the effect that Matz agreed to try his best to keep himself and others around him safe, and that if he had thoughts of fighting, intimidating others, destroying property, or committing violence towards himself or someone else, or if he had thoughts of ending life (either his or someone else's), Matz would tell his psychologist, social worker, unit sergeant, or whomever was around him so that they could help to keep Matz safe. It would have then had a period of time specified to maintain the desired behavior with an agreement that if it was met, PSU would recommend Matz to the Coping Skills Program at WRC, or that they would transfer him to CCI or to step 2 in HSC.

experiencing any suicidal/homicidal thoughts, plans, or intent or thoughts of self harm. Matz displayed a hostile and often defiant attitude that continued to cause significant impairment in his daily, social and institutional functioning. Matz reported that he would like to change but showed limited motivation in exploring his personal perception of his negativistic pattern of behaviors and his poor attitude toward authority figures. Spotts' plan was that Matz continue to be followed by PSU for clinical monitoring.

On October 7, 2005, Kaemmerer saw Matz per HSC request. Matz reported that he believed he had been doing better behaviorally over the last three weeks. His mental status was positive and unremarkable for symptoms of mental illness or emotional disorder. Kaemmerer reinforced Matz' positive attitude and behavior by pointing out to him his use of self-control.

Also on October 7, 2005, Matz submitted a written request and saw Spotts. Matz reported some concerns regarding family issues, but denied having any suicidal/homicidal thoughts, plans, or intent or thoughts of self harm. Spotts provided Matz with supportive counseling and allowed him to discuss his thoughts and feelings. Matz agreed to contact PSU for clinical services as needed.

On October 24, 2005, Kaemmerer saw Matz for MH-1 monitoring. Matz had recent episodes of self-abuse and property destruction, but he reported that he was doing okay. His mental status was unremarkable for mental or emotional disorder. Kaemmerer's plan was to continue MH-1 monitoring.

27

On October 25, 2005, Spotts saw Matz per his request. Matz reported that he was happy as he was being offered a behavioral contract. Matz denied any suicidal/homicidal thoughts, plans, or intent or thoughts of self-harm and did not appear to be in acute psychological distress at that time.

On October 27, 2005, Froelich met with Matz in the due process room of HSC to discuss a treatment plan with him. Froelich noted that Matz is a man who is constantly searching for medications and medications that are not available to him such as Clonazepam and Neurontin.[4] Matz stated that he had thoughts of suicide daily, but did not act on them. For most of their meeting, Froelich and Matz discussed his search for medication. They eventually agreed upon a trial of Chlorpromazine, a first generation anti-psychotic medication sometimes used to help control intensity of anger, assist in promoting sleep and, by helping control intensity of anger, aid the patient in making less self-defeating decisions. Froelich encouraged Matz to retry antidepressants because there was a depressive component to Matz' personality. Froelich also encouraged Matz to consider a behavior contract that would allow him to go to a different institution. Froelich prescribed Matz Chlorpromazine 25 mg q.h.s. (once every evening).

On October 28, 2005, Kaemmerer saw Matz per security referral on this MH-1 monitoring. Matz reported that he wanted observation status as a means of addressing angry

_____

[4] Clonazepam is a benzodiazepine anti-anxiety medication that is a controlled substance and avoided commonly because of frequency of abuse. Neurontin is an anticonvulsant used for epilepsy, pain syndromes and no longer used for anxiety or major psychiatric disorders.

28

feelings before they got out of control. Kaemmerer observed that Matz' mental status was angry and tense and he had a rigid physical appearance. Kaemmerer discussed Matz' angry feelings with him and looked at strategies he had employed in his adolescence and early adulthood to deal with them. Matz expressed interest in developing other, more successful, strategies, which he and Kaemmerer discussed. His anger dissipated and his rigidity faded. His need for observation placement diminished.

Also on October 28, 2005, Spotts saw Matz per his request. Matz reported that he did not want to have a meal tray in his cell because if he became angry he would hold it and did not want to get a conduct report for holding his meal tray. Matz wanted Spotts to order a tray restriction for him.

Spotts saw Matz again on October 28, 2005, upon his verbal and written request. Matz reported that he felt like he was going to explode and described a recent conflict he had with HSC staff. Matz stated he was upset after being awakened by staff to conduct a cell search and that staff were unnecessarily targeting him to prevent him from being transferred out of WCI. Matz felt that staff was attempting to provoke him. He was anxious, argumentative and appeared distressed. However, Matz denied suicidal/homicidal thoughts, plans, or intent or thoughts of self-harm. Spotts encouraged Matz to use the coping strategies that were previously discussed with him by the Crisis Intervention Worker. Spotts also advised security staff of Matz' intent to hold his meal tray and his request for a bag lunch.

29

On November 11, 2005, Kaemmerer saw Matz for MH-1 monitoring. Matz denied self-harm thoughts at this time. Matz reported that he was interested in a behavioral contract that would get him transferred to another institution if successful. His mental status was unremarkable for mental illness or emotional disorder. Kaemmerer's plan was to develop a behavior plan for Matz with HSC staff and to continue MH-1 monitoring.

On November 16, 2005, Kaemmerer saw Matz for high maintenance MH-1 monitoring. Matz reported that he was doing okay and had no problems to report. His mental status was unremarkable for symptoms of mental illness or emotional disorder. Kaemmerer's plan was to continue high maintenance MH-1 monitoring. On December 2, 2005, Matz was transferred to Columbia Correctional Institution.

Matz attempted to harm himself on numerous occasions while in HSC. Each attempt was written up in a Review of Offender in Observation (DOC-27) form; Ankarlo ultimately reviewed each form. Each time, WCI staff responded to Matz' threats of self harm by placing him in observation status and/or contacting the appropriate clinical staff for evaluation. Matz' requests for transfer were not ignored. It was determined that he was not appropriate for a transfer to the Wisconsin Resource Center (WRC).

## III. ANALYSIS

The defendants contend that they are entitled to summary judgment because: (1) the plaintiff's Eighth Amendment rights were not violated by his placement and/or

subsequent confinement in the HSC at WCI; (2) the defendants are entitled to qualified immunity; and (3) defendants Frank, Kingston, Kallas and Schrubbe were not personally involved in the occurrences underlying the plaintiff's claims. The plaintiff contends that the conditions of confinement in the HSC at WCI constitute cruel and unusual punishment and that his placement and confinement in the HSC at WCI was in deliberate indifference to his mental health needs.[5]

## EIGHTH AMENDMENT

The Eighth Amendment proscribes cruel and unusual punishment in cases of official conduct which is not part of the formal penalty for a crime if a plaintiff demonstrates: (1) a "sufficiently serious" deprivation and, (2) that officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). To prevail on his Eighth Amendment claim, the plaintiff must show that he was subjected to conditions which denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison conditions cannot rise to the level of cruel and unusual punishment unless the conditions produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. The plaintiff must also show that the defendants acted with a culpable state of mind:

---

[5] The plaintiff filed a pleading styled as a motion for an order denying the defendants' motion for summary judgment (Docket #109). The court's review of this pleading reveals it is actually a response to the defendants' motion for summary judgment and will be treated as such. The plaintiff's motion will be denied.

31

> [A] prison official may be held liable under the Eighth
> Amendment for denying humane conditions of confinement only
> if he knows that inmates face a substantial risk of serious harm
> and disregards that risk by failing to take reasonable measure to
> abate it.

*Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

In addition, deliberate indifference to the serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, and thus is proscribed by the Eighth Amendment. *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer*, 511 U.S. at 834; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle*, 429 U.S. at 104-05; *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). To defeat the defendants' motion for summary judgment, the plaintiff must cite evidence from which it can be inferred that he had a serious mental health need and that prison officials were deliberately indifferent to this need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

### Conditions of Confinement

It is undisputed that the plaintiff was confined to the HSC from February 14, 2005 until December 2, 2005, as a result of his involvement in a physical altercation with another inmate. During that time, the plaintiff was allowed to leave his cell for twice weekly

32

showers, up to four hours of recreation per week, legal recreation, medical appointments and video visits with family and friends. There is one constantly illuminated 9-watt florescent light in HSC cells. Other in-cell lights are controlled by inmates. In addition, each cell has a fogged/frosted window through which inmates can tell whether it is daytime or nighttime.

HSC inmates have limited contact with other people. The HSC building is meant to house offenders from general population who have violated rules of the institution and have been placed in segregated status. However, HSC inmates have contact with prison personnel on a daily basis when meal trays are handed out. Contact is also made when the inmates shower, go to Health Services Unit appointments, go to recreation, and have visits from attorneys or family and friends.

In addition to the contact mentioned above, it is undisputed that the plaintiff had frequent mental health related contacts while he was in the HSC. Matz was seen on the following dates by the referenced PSU personnel:

(1) February 17, 2005 - Sara Coleman

(2) February 28, 2005 - Kaemmerer

(3) March 21, 2005 - Froelich

(4) May 25, 2005 - Kaemmerer

(5) June 2, 2005 - Kaemmerer

(6) June 8, 2005 - Kaemmerer

(7) June 13, 2005 - Ankarlo

33

(8) June 13, 2005 - Froelich

(9) June 21, 2005 - Ankarlo

(10) June 22, 2005 - Kaemmerer

(11) July 14, 2005 - Spotts

(12) August 1, 2005 - Ankarlo

(13) August 3, 2005 - Spotts

(14) August 5, 2005 - Spotts

(15) August 8, 2005 - Kaemmerer

(16) August 9, 2005 - Kaemmerer

(17) August 10, 2005 - Spotts

(18) August 16, 2005 - Kaemmerer

(19) August 18, 2005 - Froelich

(20) August 23, 2005 - Spotts

(21) August 31, 2005 - Kaemmerer

(22) September 7, 2005 - Spotts

(23) October 7, 2005 - Kaemmerer

(24) October 7, 2005 - Spotts

(25) October 24, 2005 - Kaemmerer

(26) October 25, 2005 - Spotts

(27) October 27, 2005 - Froelich

(28) October 28, 2005 - Kaemmerer

(29) October 28, 2005 - Spotts

(30) November 11, 2005 - Kaemmerer

(31) November 16, 2005 - Kaemmerer

Determining whether the plaintiff's constitutional rights have been violated requires a "fact-intensive inquiry under constitutional standards." *Gillis v. Litscher*, 468 F.3d 488, 492-93 (7th Cir. 2006) (quoting *Chandler v. Baird*, 926 F.2d 1057, 1064 (11th Cir. 1991)). In *Chandler*, a case which the Seventh Circuit Court of Appeals has cited with approval,

> the inmate was confined in a cell with no clothing except undershorts and with a plastic-covered mattress without bedding. The temperature in the cell was alleged to be as low as 60 degrees. The inmate contended that he sometimes slept huddled with a roommate, sleeping between two mattresses. The prison officials disagreed, saying that the cell was controlled by the same thermostat that controlled areas of the prison occupied by nurses and no one else complained about the temperature. They acknowledged, however, that the other people in these areas were fully clothed. The inmate also received no toilet paper for 3 days. The Chandler court vacated a grant of summary judgment for the prison officials and sent the case back to the district court for trial.

*Gillis*, 468 F.3d at 493. *See also Lewis v. Lane*, 816 F.2d 1165 (7th Cir. 1987) (an allegation of inadequate heating may state an Eighth Amendment violation); *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir. 1981) (confinement in isolation without adequate clothing or bedding supports an Eighth Amendment claim: "clothing is a 'basic necessity of human existence'").

35

The plaintiff spent less than ten months in segregation status in the HSC. The conditions there, though not comfortable, have not been shown to produce the deprivation of a single, identifiable human need. The plaintiff's allegations regarding feces and broken glass in his cell are unsupported by admissible evidence. There is nothing in the record to corroborate the plaintiff's allegations.

The plaintiff also claims that the constant illumination of his cell violates his Eighth Amendment rights. In *King v. Frank*, 371 F.Supp.2d 977, 985 (W.D. Wis. 2005), the court granted summary judgment on a claim regarding constant illumination of a cell after finding that the plaintiff did not satisfy his burden to show that he suffered serious harm or was deprived of a basic human need. Here, constant illumination by nine-watt bulbs (or even two nine-watt bulbs in observation cells) did not subject Matz to any risk of serious harm or deprive him of a basic human need. Like the plaintiff in *King*, Matz presented no evidence of medical or psychological problems resulting from the light in his cell. *See id; see also Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997)(holding that prisoner's "conclusory allegations, without backing from medical or scientific sources" that inadequate ventilation cause him respiratory problems were insufficient to overcome summary judgment on Eighth Amendment claims).

In any event, Matz has not shown that the conditions in his cell were objectively substandard. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and 24-hour lighting with

36

low-watt fluorescent bulbs does not objective constitute an "extreme deprivation." *See Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997). The relatively short amount of time that the plaintiff spent in the HSC, together with conditions that do not rise to the level of severity that other courts have found may violate an inmate's rights, lead to the conclusion that the conditions in the HSC do not implicate the Eighth Amendment. Thus, there is no need to determine whether the defendants acted with a sufficiently culpable state of mind.

### Deliberate Indifference to Mental Health

Turning to the deliberate indifference to mental health claim, the first question is whether the plaintiff had a serious medical need. WCI records indicate that throughout his time in the HSC, the plaintiff's mental health classification was "MH-1," indicating a mental health need, but no serious mental illness. (Ankarlo Aff., Ex. D.) Also throughout his time in the HSC, his Axis I Diagnosis was "History of Tourette's Syndrome" and his Axis II Diagnosis was "Antisocial PD w/history of Borderline Personality Traits." *Id.*

Although the plaintiff was not diagnosed with a serious mental illness, it is undisputed that the plaintiff attempted to harm himself a number of times while housed in the HSC. Therefore, for the purposes of deciding the defendants' motion for summary judgment, the court will assume that the plaintiff's mental health issues qualify as a serious mental need. *See also Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (it is well-settled that suicide is an objectively serious harm).

37

The next question is whether by placing the plaintiff in the HSC, the defendants were deliberately indifferent to the plaintiff's serious mental need. In that regard, the court is mindful that, in most cases, managing prisons is not a job for the federal courts:

> Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state ... how to run its prison system.

*Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006) (officials at the Wisconsin Secure Program Facility did not unconstitutionally subject homicidal schizophrenic inmate to cruel and unusual punishment, absent evidence that they knew conditions of confinement, *i.e.*, heat, constant illumination, and lack of sound, were making his mental illness worse) (quoting *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985)).

It is undisputed that inmates who violate the rules of the DOC 303 and might otherwise engage in activities that threaten the safety and security of the institution are placed in the HSC. The DOC does not use a mental illness screening tool with regard to placement in the HSC. A mental illness screening is not required to place an inmate in segregation status in any DOC institution except for the Wisconsin Secure Program Facility. Nevertheless, upon an inmate's transfer to the HSC, if it is determined that the inmate has mental health needs, defendant Ankarlo will refer them to a HSC clinician.

38

It is undisputed that while he was in the HSC, the plaintiff was closely monitored by PSU staff and received frequent mental health treatment. The plaintiff was seen by Coleman once, defendant Ankarlo three times, defendant Froelich four times, defendant Spotts nine times, and defendant Kaemmerer fourteen times, for a total of 31 contacts with PSU staff. The record does not support a finding that any defendant acted with deliberate indifference to the plaintiff's serious medical needs. Rather, the undisputed facts show that the plaintiff was provided with ongoing psychological assistance while he was in the HSC. Based on the foregoing, the court will grant the defendants' second motion for summary judgment on the plaintiff's Eighth Amendment claims.

## PERSONAL INVOLVEMENT

The defendants also argue that defendants Frank, Kingston, Kallas and Schrubbe should be dismissed for lack of personal involvement. Section 1983 creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Since a section 1983 cause of action is against a 'person,' in order '[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Johnson*

39

*v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). "To be personally responsible, an official 'must know about the conduct or facilitate it, approve it, condone it, or turn a blind eye.'" *Id.* Section 1983 will not support a claim based on a *respondeat superior* theory of liability. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). The court's grant of summary judgment in favor of the defendants on the plaintiff's Eighth Amendment claims renders this argument moot.


## IV.  ADDITIONAL MOTIONS

The plaintiff filed a motion for a preliminary injunction (Docket #97), seeking a transfer from Waupun Correctional Institution. He has also made two written requests for injunctive relief (Docket #136 and #137). To prevail on a motion for a preliminary injunction, the plaintiff shoulders the burden of establishing: (1) a reasonable likelihood of success on the merits; (2) there is no adequate remedy at law; (3) he will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the public interest will not be harmed by the injunction. *See Goodman v. Illinois Dept. of Financial and Professional Regulation*, 430 F.3d 432, 437 (7th Cir. 2005); *see also Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002) and *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). The balancing for this test involves a sliding scale analysis: the greater petitioner's chances of success on the merits, the less strong a showing petitioner must make that the

40

balance of harm is in her favor. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). As discussed above regarding the defendants' motion for summary judgment, the plaintiff has not succeeded on the merits of his claims. Therefore, the court will deny the plaintiff's motion and requests for injunctive relief.

The parties have also filed several motions regarding the pleadings, which the court will now address. The defendants filed a motion for an extension of time to file their reply brief (Docket #114), which the court will grant. The plaintiff filed a motion to amend proposed findings of fact (Docket #138), which the court will grant. The plaintiff also filed a motion for an order "in opposition against defendants' amended filings." (Docket #133) The court will deny this motion. However, in granting the plaintiff's subsequent motion to amend his findings of fact, the court has provided the alternative relief the plaintiff sought, which was the opportunity to amend his submissions to the court.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #75) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for a preliminary injunction (Docket #97) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for an order denying defendants' motion for summary judgment (Docket #109) is **DENIED**.

41

IT IS ALSO ORDERED that the defendants' motion for extension of time (Docket #114) is **GRANTED**.

IT IS ALSO ORDERED that the plaintiff's motion for order (Docket #133) is **DENIED**.

IT IS ALSO ORDERED that the plaintiff's motion to amend his proposed findings of fact (Docket #138) is **GRANTED**.

IT IS ALSO ORDERED that the plaintiff's requests for injunctive relief (Docket #136 and #137) are **DENIED**.

IT IS FURTHER ORDERED that this case is **DISMISSED** and the Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of September, 2008.

**SO ORDERED,**

*s/ Rudolph T. Randa*

**HON. RUDOLPH T. RANDA**
**Chief Judge**

42